v. Green Apple Supermarket of Jamaica, Inc. 18-2407-AG Hello? Who is this? I'm the, uh, David Anderson, the respondent. Is the Petitioner's Council available? Do we have, do we have counsel from the National Labor Relations Board? We do. This is Barb Sheehy with the National Labor Relations Board. Even though we initiated the cause of action by way of an enforcement proceeding, we go second. So we let the, the employer, who is Mr. Dan right there, the respondent, or David, Mr. David Yan, the respondent, I think is going first. If you say so. We talked to the clerk beforehand. People seem to agree. That's fine. Is this Mr. Yan? Yes, Your Honor. Okay. Why don't you proceed? Thank you, Your Honor. Good afternoon, Your Honor. May I please record, my name is David Yan. I'm the respondent, Green Apple Supermarket of Jamaica, Inc. At this moment, Your Honor, that the respondent is no longer in business, actually closed down business last September, in September 2018. And they started in August 2015, then lost money, more than $180,000 in 2015, and $729,000 in 2016, and $1,452,751 in 2017. So that, it was closed. And General Counsel, National Labor Relations Board, in their briefing, that respondent operate a chain store. That's not true. That's no facts to support that. That's the respondent only operate one store. At this moment, there's nothing in existence. It's closed. I don't know how to enforce the judgment. Anyway, my first point is that the, the large of the board refused to consider the respondent's financial hardship when the, when the board, I mean, when General Counsel commences actions, that's in the record. So that, that's the, the board failed to consider the respondent's financial hardship. And so that's, the petition should be declined by the court. It was the major petition by the respondent to terminate two employees. This case is about five employees in the meat department. There were about 20 or so employees. It's not a big story on it. That's a small grocery store. Five employees in the meat department. Two employees were terminated. It was Anthony Smith and Joe Tino. There were three other employees still there. And there was some union elections and certification by the board. Two employees were terminated, Anthony Smith, Joe Tino, because their habitual lateness, as well as insubordination to the superior's instructions. The General Counsel called the one employee, Nicholas Amandi-Amango, to testify. General Counsel never asked the law judge to declare the witness, Nicholas Amandi-Amango, as a hostile witness. So, therefore, Nicholas Amandi-Amango's testimony should be deemed credible. He testified that Anthony Smith and Joe Tino were constantly late. It's a late, capturing late. It's not only late once, almost all the time. And Anthony Smith walked through the lunch against the store policies, because you cannot just walk over the lunch after a six-hour shift. You cannot just come late to work and say, okay, I just, to make up for my hours, I walked through the lunch, when everyone was stopped and out of lunch. So this case depends on the due intent analysis. It's about the management division, whether or not to terminate an employee when they fail to adhere to, I mean, follow the instruction of their job. And there's a case, Booth National Maintenance Corporation, over there, that's in that third. The termination is not within the business at all. It's primarily about conditions of employment, although the effect of the decision may be necessary to terminate employment. Also, that's the Starbucks case, National Labor Relations Board v. Starbucks Corporation, and the lawfulness of the discharge imprecates due motivation analysis. So that the respondent, the middle court, to consider the due motivations, one is that the business could not really sustain operations. They had to close. Secondly, among the five employees in the union department, only two employees were terminated. One is Anthony Smith v. Jotino, when the exhibit was captured late and refused to follow the management instruction to work. Excuse me. Do you have one minute left? Oh, sure. Okay. And I believe the court has the power to review the board's decision. General Counsel, National Labor Relations Board, said that the board did not have the innovative power. However, the case law talks about that the court did have the innovative power to review the entire facts and findings conclusion law by the National Labor Relations Board. And also that the respondent made a motion to amend the initial case, I mean initial brief, it was denied, and the respondent again asked the panel to consider that the amended brief as the submissions. Thank you, Your Honor. Thank you very much. Are there any questions, Judge Kearse? No questions here. Judge Hall. With the presider's permission, I just, I have something of a procedural line of inquiry that I would like to pose to Mr. Yan. Sure, Your Honor. You filed an original brief in this case, and the clerk's office indicated to you, did it not, that you were to refile it with page numbers? Yes. And then you asked for permission to amend the brief, and Judge Sullivan on behalf of the court indicated, no, you may not amend the brief, just fix it the way the clerk's office did? Yes. And is there a reason that you, notwithstanding the order, made some changes to the brief? What happened is, Your Honor, that the July 30th, the year, July 30th last year, there was an incident that happened to me. I was injured when somebody robbed my cell phone in the street in a flashing around nine o'clock at night. I got injured. I could not really walk, and then it was kind of very time-sensitive to put up an initial brief. I made all my efforts to submit an opening brief, and then I did the, when you compare the initial brief and the amended brief, that's only all issues that's already presented. The only thing about it, the table of contents, and table of authorities, and some of the factual and correction of the wording, I don't believe that's any prejudice to the petitioner, to the National Labor Relations Board. Yeah, I'm not suggesting it is. I just was concerned that the court had indicated in order what you were to do, and you took it on yourself to go beyond that. I think that the case should be… You agree you did, right? You had some corrections you wanted to make, and so you went ahead and did them? Yes, Your Honor. It was done in a very short period of time. It's only about two or three days, and I think that the case should be decided on the merits. It's not by the… Yes, no, I'm sure the panel will decide it on the merits, but I wanted to ask you about that concern that I had, so thank you for your responses. That's all I have. Thank you. Any further questions, Judge Kearse? Judge Hall? No. Okay, fine. We'll turn then to counsel for the National Labor Relations Board, Ms. Sheehy. Thank you, Your Honors. Good afternoon. May it please the Court. Barbara Sheehy for the National Labor Relations Board. The Board is seeking full enforcement of its order that the company has committed numerous violations of the Act by engaging in an anti-union campaign after learning that its employees were interested in union representation. Its violations include threats of store closures, threats of firing, unilateral changes to working conditions without notifying or bargaining with the union, disciplining and ultimately discharging two visible union activists, and refusing to provide the union with requested information. We believe there are three straightforward questions for the Court to consider. The Board submits that these questions are easily answered and favor full enforcement based on well-settled principles of law, a largely uncontested record evidence. Once the web of preserved and unreviewable issues is untangled, we believe that we will have full enforcement. The three issues are, one, the Board is entitled to some reinforcement of those parts of its orders remedying several uncontested violations. Two, the Board properly found that the company unlawfully disciplined and then discharged two employees for union activity. And three, the Board properly exercised its discretion in awarding traditional remedies, including reinstatement and back pay, and the extraordinary remedy of a notice reading to address the special remedy, rather, to address the unlawful discharges. Throughout my brief time today, I hope to make clear what is and what is not properly before the Court in an effort to demonstrate what we believe is the narrowness of this case. So let's start with the unfair labor practices found by the Board that the company does not challenge before the Court. The company does not contest that it unlawfully threatened employees with stricter enforcement of work rules because of their union support. The company does not contest that it unlawfully threatened discharge and plant closure if employees selected union representation. The company does not contest that it unlawfully made unilateral changes to the terms and conditions of employment despite the exclusive representative. And the company does not contest that it unlawfully refused to provide the union with requested and relevant information. The company, taking no issue with any of these violations, as we state in our brief, and as established by the law of this circuit, entitles the Board to some reinforcement. The company has waived these challenges. This is what we believe is the first of the three straightforward issues before the Court. Let's look at the second issue. And again, I'd like to start with what is, in our view, properly before the Court. The second issue involves whether substantial evidence supports the Board's finding that the company disciplined and discharged two employees for unlawful reasons. In making this finding, the Board invoked the well-known right-line analysis, which, as the Court is aware, has several analytical pieces. Here, the company's litigation decisions before the Board heavily circumscribe which of those pieces can be reviewed by this Court. As we argue in our brief, we maintain that the only pieces of the right-line analysis that the Court has jurisdiction over are, one, whether the Board's finding of pretext is supported by substantial evidence, and, two, whether the Board's finding that the company did not show, by way of an affirmative defense, that it would have discharged Smith and Tenao in any event, is likewise supported by substantial evidence. In regard to these two findings, the company's challenges are very, very limited, and they are necessarily cabined by what it argued to the Board. Recall that the Board had before it only the company's enumerated exceptions. It did not have a brief in support of exceptions thereof. So the exceptions themselves need to have put the Board on notice of any complaints that the company intends to bring now before the Court. We submit here that the company only generally accepted to these findings as to pretext and legitimate nondiscriminatory reason, and all of the specific arguments it now tries to put before the Court are improper. With regard to pretext, we list the improper argument at pages 37 and 38 of our brief, and with regard to the legitimate nondiscriminatory reason defense, we list the jurisdictionally barred arguments on page 41 of our brief. I won't go back through those now. I'll leave that to what we've submitted. So under the Board's view, we turn now to the full right-line analysis. The issue of motive is not in dispute. That means the Court is not called on to assess any of the considerations here that led the Board to find unlawful motivation, including the existence and knowledge of protected activity, the demonstrated hostility toward that activity, the suspicious timing of the terminations, and the absence of any full and fair investigation. Point being, motivation is established. The Court's first consideration, then, is whether substantial evidence supports the Board's finding as to pretext. I'll take a moment to highlight the underpinnings of the Board's determination. With regard to Smith, who the company claimed to have fired because he was tardy once and worked through lunch twice without punching out, the Board finds this is protectful on the basis of four considerations. First, they credited Smith's testimony that no one was disciplined for tardy. Second, the Board relied on the absence of any written store policy against working through lunch. Third, the Board relies on the lack of any written consequence for failing to punch in or out. And fourth, the Board relies on the utter failure of the company at any point to offer any rationale as to why these three instances were so severe as to warrant immediate termination. With regard to Teneo and Pretext, who was fired ostensibly for three tardies, the Board relied on the following. The absence of any store policy mandating discharge under these circumstances. Two, Teneo's credited testimony that he was often late to work and allowed to make up the time on the back end with supervisory approval. And third, Teneo's credited testimony that he had never been issued any counseling before, which was bolstered by the absence of any written documentation to the contrary. The company's preserved arguments, the ones presented to the Board, amount basically to this. No, we disagree. You are wrong. That's not enough to show that the finding lacks substantial evidence. The Pretext finding should not be disturbed. With regard then to the final component of Rightline, the affirmative defense that the company would have acted the same regardless of protected activity. The Board rejected that claim as, quote, clearly baseless. The company could not show that it treated other employees the same. Again, its generalized exception is simply this. Board, you're wrong. Or ALJ, you're wrong. This is insufficient. And as we argue in our brief, the remaining arguments, such as whether Smith and Teneo lost protection of the Act, or whether the company's alleged financial hardship is relevant, none of these are properly before the Court because the company did not bring them to the Board in the first instance, as it must to preserve this Court's jurisdiction. Adding up these pieces, the Court should affirm the Board's ultimate finding, that the disciplines and discharges were unlawful. The final issue, the third and final issue, again, equally straightforward. It's the remedy. I'll start again with trying to focus the Court on what we believe is the very narrow issue before it. At the risk of sounding like a broken record, the company's exceptions filed with the Board control what the company can bring to the Court. And what the company presented to the Board was simply a generalized challenge to the entire remedy, without specifics, without argument. This is not enough to defeat the Board's broad authority in remedying the unfair labor practice violations. That is the sole question the Court needs to consider with regard to remedy. Did the Board properly exercise its broad discretion in remedying the company's numerous violations of the Act? It's the sole question, regardless of the company's newly minted challenges to the traditional remedy of reinstatement and back pay for the two discharge employees. Those were not preserved before the Board and cannot be brought to the Court for the first time. I quickly add that the remainder of the remedies that were not even challenged before the Court, so this is with the exception of what they now try to bring as it relates to the reinstatement and back pay, the remainder of those are not just jurisdictionally barred, but they are also waived as not having been raised. In sum, we ask for full enforcement of the Board's order. I'm happy to answer any questions or rest on our brief. Thank you. Thank you very much. Let me ask Judge Kearse if he has any questions. Not at this time. Judge Hall? Thank you. Yes, I have two questions, or two lines of questions, actually. Council, the company we know from the record, or we have been told, is out of business. And I tend to agree with, or I do agree with the government's argument, but we'll see what my colleagues think. But that does not moot the relief you're asking for. That is essentially our entering in a direction to enforce the order. But why does that not moot the matter that's before us? Thank you, Your Honor. As we highlight in our brief, the Board is still entitled to enforcement of its order. So at that point, once it has a court-enforced order, it can then move the issues and move into the compliance phase. This certainly is not the first employer to close during the issuance of a decision and order and going into court. So this is nothing new. I agree with you. What does compliance then consist of? More from my own edification, perhaps. Sure, absolutely. So the Board has a bifurcated process, right? We do the liability aspect first. That's what we're doing right now. And then, assuming a court-enforced order, it goes into the compliance phase, which happens at the regional level. The regional folks, then, who are designated specifically as, I think, compliance officers, then work with the employer. First, they reach out to the employer. And I believe this is the way that it works. They come up with their own process, their own specifications for what they're anticipating the back pay award should be. If reinstatement is not possible and there really are truly no other stores that these employees can be put back into, that's under consideration. And so the parties themselves, the Board, the regional office, and the employer, try to reach an agreement. If that doesn't work, and hopefully that happens, and then they move forward with whatever parts of the remedy can still be affected if there's a closure. If that doesn't work, the employer, the process can start again before the Board. There could be a hearing, a compliance hearing, before the Board. If the employer and the regional office can't agree on what compliance looks like now in 2020, there could be a hearing before the Board. And even that Board order, after a compliance hearing, is subject to judicial review. So first, the parties amicably try to... But what if there's no party with which to reach an agreement? That's the import of my question. I guess I'm not familiar with how... Like a company goes out of business and doesn't exist anymore, who do you agree with? You, meaning the Board and the compliance folks. Right. And I guess that would be some sort of issue, I think, sorted out in compliance. I don't know enough about, for instance, successor employers if there's... I don't know enough about if there's any sort of transfer assets or a secondary employer that's... See what I'm saying? I think there are other ways. Just because Green Apple, this supermarket, doesn't exist perhaps anymore, has closed. I'm not certain that compliance doesn't still try to figure out if there's some entity with a strong enough connection still to this employer that it can't still try to do something. But again, that's something in compliance that I'm afraid I don't know the specifics on. Fair enough. Thank you very much. The one other very quick question. I'm assuming from reading your brief that you had no problems responding to the brief that you received from the employer. I don't know that I would... It wasn't analytically more difficult or legally more challenging, but it certainly did cost us time because we didn't realize that several of us in the office working on a brief were working off different versions of the brief. I see. Because different people downloaded different times. But that's not to say surely I believe that our brief that we submitted, because at the time we submitted, we had only notified the court by the clerk's office that we had just then discovered that the two different... I had no reason before that to compare to PDF. So we notified the clerk as soon as we found out. It happened to be very late in the game, so to speak, just on the eve of us filing our own brief. So at the time that we filed, we came to the determination we will respond to everything. So certainly I don't feel that we were prejudiced in the sense that I didn't have the opportunity to respond. But I'm not sure that it's fair to say that there wasn't any effect on us because there was a lot of confusion, as I said, when different people downloaded different PDFs at different times. Thank you very much. I have no further questions. Thank you. Thank you. Judge Hall asked some of the questions that I had in mind, and I think we simply will turn to Mr. Yan to see if he has any time, a minute or two to just respond. Yes. Thank you, Your Honor. I have three minutes. Go ahead. I can respond to the general counsel's argument. I believe that common sense should prevail. And since business closed, it's not like the chain store, like the general counsel's imagined that the chain store. No other business, this respondent, has any connections. And the question is, how do we enforce this one? And where's the general manager? General manager quit before the general counsel commenced his actions. General counsel, I mean, general manager never came because when he saw the losing business, he left, quit. So that's why a lot of, and this is a small store, it's not like the franchise store, they have a lot of management. And it could not really maintain a lot of business. And so I submit to the court and that the general counsel's witness, Nicholas Armando, the testimony should be taken into the consideration by the court in Genova review. And when the general counsel's own witness, Anthony Smith, Jotino were late, captured late. That due analysis of the court in the Starbucks case, seeing that that's a management decision, they had to be terminated because another employee was still there. And they even actively participate in the unions. That was, it was the argument of the board is inaccurate. It's not correct. That was the unfair labor practice of the employer or the respondent. And also in the general counsel, the National Labor Relations Board briefed saying that Jotino actively participated in the union activities. That's an error. You have one more minute. Okay. That's totally untrue because Jotino never voted for unions. That's in the record. He did not participate in the voting when he was notified to come in to vote. He did not vote for. How come Jotino is a union activities and that's the termination because Jotino's participation in the union activities. That's totally untrue. Now it turns out that there, I believe the board, that the court has, again, the power to review everything. And we cannot respond, cannot waive all these arguments and exceptions because respond to closed business. And actually, nobody can really put contact with to get a decision whether or not to do or to waive, to quit, to close business. Everything's going out. Even the circumstances that has to be enforced, the order, the board's whatever orders, where's the remedies? Who's going to pay? There's no, there's no, no one can pay these two terminate employees. There's no place to stay their employment. Shareholders is not responsible for the corporate operations. General managers quit. That's only left two employees, three employees. Another employee already left for other business. That's the new department supervisor, new department, so on. And the part-time accountant that's already left for somewhere else. That's about an assistant manager. That's, how do you ask this respondent to enforce this order to announce that place already take, took over by somebody else in other business? So, I submit a court to deny enforcement because there's no place. It's a, it's really a mood to enforce it. And also, the board's brief saying that, that the termination was because their union activities. That's totally an error because Jotino never voted for the unions. Anthony Smith only used the union as something to protect his lateness and this abomination to the, to the employer, to the instructions. Thank you. Thank you very much. We'll reserve decision.